NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

EDWARD ALBERT HORNECKER, JR., BY HIS NEXT FRIEND, CLARA HORNECKER, PETITIONER, v. ALBERT BRUNNER & SONS, INC., ALBERT BRUNNER, EUGENE BRUNNER AND TRAVELERS INSURANCE COMPANY, RESPONDENTS.

Decided November 14, 1939.

For the petitioner, *Whiting & Moore.*

For the respondent, *James J. Skeffington.*

\*        \*        \*        \*        \*        \*        \*

Petitioner alleges that he is twenty-one years of age, and that on or about August 3d, 1938, he was employed by Albert Brunner & Sons, Union, New Jersey, wholesale florists, doing all kinds of heavy work, earning $20 per week; that during July he wheeled dirt, loaded flower benches, sifting dirt and potting, weeding and cultivating; on August 3d, 1938, he reported to work feeling as good as usual, at seven A. M., which was his regular time to start work every day in the year, and started in by leveling off, hauling rubbish, bricks and ashes to the dump four hundred feet down the field in a regular steel wheelbarrow, and worked at that until about nine-forty-five A. M., at which time he was called to help Mr. Jacob Hummel, an employe of respondent, in raising curtains on the field beds. The work involved reaching down and unhooking the hooks along the bottom of the frame, rolling the canvas back and tying it. He admitted that they were heavy, about

one hundred feet long, made of umbrella cloth, and he was sweating quite a bit after wheeling and doing the job, and testified "it happened while I was lifting a curtain I dropped," and again, "I reached down to grab one of the hooks and as I did, it just stuck and I fell over." He testified that it was one of the hottest days of the season, "an extra hot day," but did not know the temperature. He further stated the next thing he remembers was after the first operation in Neurological Institute, New York City, on August 7th, 1938, remaining there to sometime in September, 1938, and then was taken home, where he stayed for a little over two months. On November 14th, 1938, he returned to work for the respondent, tending and stoking boilers from December, 1938, up to two weeks before Easter and his hours were seven P. M. to six A. M., the following morning, and did not fall unconscious at any time during that period. He worked for the respondent until June, 1939, at which time he left because he felt "kind of dizzy when it got hot." In June, 1939, he was employed by a Mr. Britten, Short Hills, New Jersey, as a private gardener, doing lighter work, and is employed there to the present time. Petitioner was asked specifically if he told Mr. Jacob Hummel that he was feeling faint, he answered, "no, sir." He further denied that Mr. Hummel offered him his hat, and further denied that he walked from the place where he was unhooking the curtains to a shed to lay down, but that the last thing he remembers was that he was unfastening or unhooking the curtains and fell over unconscious. He further denied that he had a loss of appetite and felt uneasy for a few days prior to August 3d, 1938, but admitted that he seldom had headaches. He admitted that he was at Sea Girt, the National Guard Camp of New Jersey, for two weeks sometime in July, 1938, and that his duties required him to be out in the sun from six A. M. to five P. M., weather permitting, doing all kinds of work. He further admitted that to-day he feels as good as he did before August 3d, 1938, that to-day he engages in all sports, including "baseball, football, horseback riding, high diving and swimming," and performs them as well as he did before the alleged accident. The petitioner further admitted that at no time did he request medical treat-

ment from his employer and that his medical bills were paid by his father and mother. .

Dr. Theodore R. Ford took the stand on behalf of the petitioner and qualified as a neurologist. He testified that he first examined the petitioner in the ward of the Orange Memorial Hospital, August 4th, 1938. His examination at that time showed dilated pupils; double vision; upper abdominal reflexes diminished; right knee jerk greater than the left; right ankle jerk greater than the left; equivocal right Babinski; on posture holding function there was a down drift of right arm, and succession movements were slightly impaired on the right; neck was slightly stiff; blood pressure 106/58 and pulse sixty to seventy-two; petitioner had difficulty in expressing himself; and diagnosed his condition as a subdural hemorrhage, on the left side, near the motor speech area. The doctor further testified that he was given symptomatic treatment only and transferred to the Neurological Institute for further diagnostic procedure and treatment on the doctor's own advice. The doctor stated that from the facts contained in a hypothetical question, he was of the opinion that the petitioner's employment caused the subdural hematoma and acute illness. The doctor admitted that the petitioner had an abnormal blood vessel, an anastomosis between the arteries and veins in the sylvian fissure which is a congenital condition. He stated that the petitioner may have suffered from heat stroke or heat exhaustion. The doctor admitted that the petitioner was not completely unconscious on August 4th, but was confused. The doctor further admitted that a spinal tap was performed on August 4th, 1938, and six c. c. of xanthrochromic fluid was withdrawn indicating a possibility of a hemorrhage in the brain. He further stated that it takes a variable length of time for this xanthrochromic fluid to appear, depending on circumstances, but felt that this hemorrhage didn't occur prior to the collapse of the petitioner on August 3d, 1938. The doctor admitted that an individual could have a small hemorrhage in subdural area and be unaware of it. He stated that normal temperature of the body is ninety-eight and six-tenths degrees and that since the hospital temperature chart starts at ninety-

nine and two-tenths degrees, is not necessarily abnormal but could happen in normal individuals. He further stated that the blood pressure of one hundred and six over fifty-eight shown on the hospital chart was normal. The doctor further testified that the last time he saw the petitioner was at the Orange Memorial Hospital, August 4th, 1938.

Dr. Fritz Cramer was then called as a witness by the petitioner and qualified as an attending neurological surgeon at the Neurological Institute, New York, New York, specializing in nervous system, brain, spinal cord and nerves. He first examined the petitioner on August 8th, 1938, at which time the petitioner complained of a headache and stiff neck. The essential findings were as follows: Petitioner was not abnormally groggy; he had a slight weakness of the right arm; grip was weak; had some ataxia in the use of both arms and legs, greater on the right side, apparently due to weakness; he had a slight hyperreflexia on the right side with an absence of the abdominal reflexes on the right side and an absence of the plantar flexion on the right side and a positive Babinski sign and Chaddock on the right; his optic fundi was normal; the right pupil was greater than the left; he had a central type of facial weakness on the right. He stated that his diagnosis was a spontaneous sub-arachnoid and subpial hemorrhage, probably on the basis of a rupture of an abnormal group of capillary or large blood vessels in the left cerebrum. An X-ray of skull showed it to be normal except for anterior displacement of the pineal glands. He further stated that the treatment consisted of rest and an exploratory trephining exploration in the left temporal region and it was after that that he saw the petitioner. After this operation the abnormal signs persisted and an encephalogram was performed which showed the displacement of the lateral and third ventricles toward the right side. On the basis of the persistence of the neurological findings and the interpretation of there being a tumor, an osteoplastic craniotomy was performed, which disclosed an abnormal vascular condition of the skull and of the dura, and on opening the dura the underlying cerebral cortex was abnormal in several respects. After this operation, the petitioner made steady improvement, and was discharged

from the hospital on September 10th, 1938. He further stated that he last examined the petitioner on December 14th, 1938, at which time he advised the petitioner not to tend the furnaces in the greenhouse. The doctor was of the opinion that the petitioner's employment caused the acute illness of the petitioner, and further, that the circumstances surrounding his employment operating on the petitioner's pre-existing condition precipitated the acute illness. The doctor admitted that the scar due to the operation will be visible during his lifetime, but will become a fine line eventually. The doctor further admitted that six c. c. of xanthrochromic fluid obtained about one day after the collapse was not unusual in brain hemorrhages. The doctor was confronted with his report dated October 6th, 1938, wherein he stated that he "cannot say whether the injury was the competent producing cause," and he admitted that he signed said report but that was before he spoke to the petitioner and his family concerning the alleged accident. The doctor further admitted that an individual may have a slight brain hemorrhage without being aware of it though he may have such symptoms as malaise and anorexia. The doctor stated that the petitioner made a very good recovery.

Clara Hornecker then took the stand on behalf of the petitioner, and testified that she is the mother of the petitioner. She stated that on August 3d, 1938, the petitioner was brought home about ten A. M. by Albert Brunner and that she first noticed him on the floor of the car, and that he was carried into the house and put to bed. She further stated that she tried to talk to him but he wouldn't answer and after attempting to get several doctors, she called the Orange Memorial Hospital where the petitioner was taken. She testified that he was taken to the Neurological Institute, New York, where he remained for five weeks, at the end of which time he returned home and rested for several months. Mrs. Hornecker further stated that the petitioner did not complain of headaches prior to August 3d, 1938, and she admitted that he may have had headaches which she may not have known. She also stated that he fractured his shoulder in 1936. She admitted that she paid the bills of the Neurological Institute, Ambulance

Company and Orange Memorial Hospital and, further, that these bills were forwarded to the insurance carrier of the respondent.

Mrs. Charles T. Hornecker then took the stand on behalf of the petitioner and testified that she is his aunt by marriage and that the petitioner assisted her husband in his floral shop in December of 1937 for about twelve days, and the following Easter, three or four days, and that on these occasions petitioner's work was satisfactory. She further testified that the petitioner's mother brought the medical bills to her and that she forwarded them to Mr. Brunner.

The petitioner put into evidence over objection of the respondent the record of United States Bureau of Agriculture showing the average temperature, wind velocity and humidity for Elizabeth and Plainfield, New Jersey, as of August 3d, 1938, as well as a report of Mr. William Wiener, meteorologist, dated December 16th, 1938.

The respondent called as its first witness Mr. Jacob Hummel, who testified that he resides at 71 Rose street, Union, New Jersey, and on August 3d, 1938, was employed by the respondent. He further testified that on said date he was working with the petitioner removing cloths on the outside of flower frames and that the day was hot. They were working about twenty minutes sliding these cloths when the petitioner complained of severe pain in his head and grabbed for his head with both hands. Mr. Hummel stated that he threw the petitioner his hat but the petitioner wouldn't wear it and they worked for another five minutes finishing that job and together they walked into a shed where the petitioner lay down on a bench. He further stated that when he spoke to the petitioner, he received no response and then called Mr. Brunner. The petitioner walked to Mr. Brunner's car, but appeared dazed and didn't talk. He stated that before petitioner collapsed, petitioner told him that he was at an ice cream parlor the night before and that it was so cold it gave him "goose pimples."

Mr. William Wiener then took the stand on behalf of the respondent and qualified as meteorologist. He testified that on August 3d, 1938, the temperature at seven A. M. was sixty-

eight degrees, eight A. M. seventy-one degrees, nine A. M. seventy-four degrees, ten A. M. seventy-seven degrees and eleven A. M. eighty degrees; that there was no precipitation, the day was clear and that humidity at noon was seventy degrees and in his opinion, it was not the type of day to cause heat exhaustion, heat stroke or heat prostration.

Dr. Carl A. Peterson then took the stand on behalf of the respondent and qualified as a neurologist. He testified that he examined the petitioner at his office on October 21st, 1938, at which time the petitioner stated "I feel as good as ever excepting that I do not feel as strong." The neurological examination revealed pulse, eighty; temperature, ninety-seven and four-tenths; blood pressure, one hundred and twenty over seventy-six; there were areas of alopecia of the scalp over each temporal region; there were two scars in the left temporal region; the one scar is linear and extends upwards, there being no defect in the underlying temporal fascia or muscle, and no abnormal pulsation; the second scar is "U" shaped with its convexity upwards, being eleven and one-half inches long; there were no visible cranial defects and the function of the cranial flap and skull was not palpable; deep reflexes of the right upper extremity and the right lower extremity were slightly greater than those on the left side; plantar responses were normal; there were no Hoffman, Babinski, or Oppenheim; there was no swaying in Romberg and no ataxia. The doctor further testified that it is significant that petitioner complained of malaise and anorexia for four days immediately preceding his admission to the Orange Memorial Hospital, in that they may be symptoms of a brain hemorrhage. He further stated it is significant that the record at Orange Memorial Hospital discloses that six c. c. of xanthrochromic fluid was withdrawn one day after his admission to the hospital, indicating that there was a slow leakage of blood into the cerebro spinal spaces starting at least three or four days before his collapse. It takes at least three days for the red blood cells to break up liberating the hemoglobin which in turn is converted into a yellowish hemasiderin, causing the spinal fluid to be xanthrochromic. The doctor further stated that the petitioner had a congenital

and pre-existing abnormal condition of the cerebral arteries and veins which was revealed by operation at the Neurological Institute. This abnormal condition expressed itself in episodes of headache, malaise and anorexia on a number of occasions. The doctor further testified that an individual may suffer with a slight hemorrhage in the brain and work about four days with no apparent discomfort except such symptoms as malaise and anorexia. He further stated that he examined the records of the Orange Memorial Hospital, Neurological Institute, the hourly temperature, humidity and wind velocity of the meteorologist's report, and that the petitioner's activities and the conditions under which he worked on August 3d, 1938, excludes the presence of sun stroke, heat stroke or heat exhaustion, but that his acute illness was primarily caused by the congenital and pre-existing abnormal condition of the cerebral arteries and veins.

After carefully considering the testimony adduced before me, it is apparent that the petitioner had a congenital and pre-existing abnormal condition of the cerebral arteries and veins which was in nowise aggravated nor accelerated by the petitioner's work and the conditions under which he worked on August 3d, 1938, for the respondent Albert Brunner & Sons, Inc. I am satisfied that the petitioner in this instance failed to sustain the burden of proving that he suffered an injury as the result of an accident arising out of and in the course of his employment.

It is accordingly this 14th day of November, 1939, ordered that the petition be and the same is hereby dismissed.

JOHN C. WEGNER,
*Deputy Commissioner.*